No. 23-1880

# United States Court of Appeals for the Federal Circuit

CODA DEVELOPMENT S.R.O., CODA INNOVATIONS S.R.O.,
FRANTISEK HRABAL,
*Plaintiffs-Appellants*,

*v.*

GOODYEAR TIRE & RUBBER COMPANY, ROBERT BENEDICT,
*Defendants-Appellees*

**Appeal from the United States District Court for the Northern District of Ohio in No. 5:15-cv-01572, Judge Sara Lioi**

## BRIEF FOR DEFENDANTS-APPELLEES

CALVIN P. GRIFFITH
DAVID M. MAIORANA
JOHN C. EVANS
THOMAS S. KOGLMAN
JONES DAY
901 Lakeside Avenue
North Point
Cleveland, OH 44114
(216) 586-3939
cpgriffith@jonesday.com

GREGORY A. CASTANIAS
TRACY A. STITT
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
(202) 879-3939
gcastanias@jonesday.com

*Counsel for Defendants-Appellees The Goodyear Tire & Rubber Company and Robert Benedict*

## TRADE SECRETS IN DISPUTE

The trade secrets that remain in this suit, as defined by Coda and its attorneys, are as follows:

7. Coda's design and development of a multi-purpose interface for transporting air in a self-inflating tire that can connect to the air source, connect to the tire interior, connect to the peristaltic pump, serve as an end to the peristaltic pump, connect to the regulator, carry the regulator, go around or through the bead, go around or through the tire layers, click to the bead and hold the filter.

11. Coda's knowledge of how to design and develop self-inflating tire pump and groove solutions, consisting of round pump tubing in an outward-facing groove with straight, angled interior geometry; pump tubing with geometry that interlocks with its seat; pump tubing with elliptical interior cross-section; variant pump tube, groove and chamber dimensions, size, and materials; pump tube and groove design to minimize internal friction; a "tubeless" pump solution (*i.e.*, a pump that may compose an integral part of a tire); cross-section designs that minimize stress on compression in order to improve durability; and tubing with reinforced wall.

20. Coda's knowledge of how to design and develop self-inflating tire systems with circulating and non-circulating pump variations, comprised of the disclosure of technical information through observations and descriptions of the three-way valve regulator, and explanations of the function and air-paths for the states of circulation and inflation; closure elements related to recirculation systems and a pressurized air reservoir that would permit the storage of air within the system without the need to engage the pump tube with each tire revolution; recirculation at different pressures, such as ambient pressure; recirculation through various paths, such as through the tire, the atmosphere, and the pump tube; the safety benefit of recirculating around the pump tube isolated from the tire cavity; a check valve on intake (between the pump tube and the atmosphere) to only permit air in when pressure in the pump tube falls below atmospheric pressure; and a check valve on output (between the pump tube and tire interior) to only allow air into the tire when pressure in the pump tube exceeds the tire pressure.

23. Coda's development of a functional self-inflating tire as demonstrated by the test results confirming that the tire pump can generate pressure higher than the pressure in the tire cavity, through the test results showing that the pump placed on the tread could generate 6.5 absolute atmospheres of pressure (5.5 relative

atmospheres); the test results showing that the tube-in-groove pump of the prototype could generate 3.3 absolute atmospheres of pressure; and test results that demonstrated that the Flap Tubes could generate 1 relative atmosphere of pressure.

24. Coda's knowledge regarding the optimal location for placement of a pump in a tire for tire manufacturers, namely, in the sidewall close to, and above, the rim where the tire cyclically deforms in response to deformation.

## CERTIFICATE OF INTEREST

Counsel for Defendants-Appellees certifies the following:

1. Full Name of Parties Represented by me:

The Goodyear Tire & Rubber Company
Robert Benedict

2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is: None.

3. Parent corporations and publicly held companies that own 10% or more of stock in the party: BlackRock, Inc. and The Vanguard Group, Inc..

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case):

**Jones Day:** Kerry A. Barrett (no longer with firm); Michael P. Atkins; Thomas R. Goots.

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this Court's decision in the pending appeal: None.

# TABLE OF CONTENTS

**Page**

TRADE SECRETS IN DISPUTE .......... i

CERTIFICATE OF INTEREST .......... iii

TABLE OF AUTHORITIES .......... vii

TABLE OF ABBREVIATIONS .......... x

STATEMENT OF RELATED CASES .......... xii

INTRODUCTION .......... 1

COUNTERSTATEMENT OF THE ISSUES .......... 3

COUNTERSTATEMENT OF THE CASE .......... 4

I. Factual Background .......... 5

A. Self-Inflating Tires .......... 5

B. Coda Publicized and Patented Its Self-Inflating Tire Ideas .......... 6

1. Coda's Disclosures of Locating the Pump in the Sidewall Close to and Above the Rim .......... 7

2. Coda's Disclosures of Pump Configurations .......... 15

3. Coda Discloses the Circulating and Non-Circulating Pump Ideas of TS20 .......... 16

C. Goodyear Was Interested in SIT, but Learned That Coda Did Not Have an Actual Self-Inflating Tire .......... 18

1. The Parties' NDA .......... 19

2. The January 2009 Meeting .......... 19

3. The June 2009 Meeting .......... 20

4. Goodyear Decides Coda Is Not a Viable Partner .......... 22

D. Goodyear's Air Maintenance Tire (AMT) Program and the '586 Patent .......... 23

1. The '586 Patent .......... 24

2. Goodyear's AMT Projects Failed .......... 26

E. Coda's SIT Efforts Failed .......... 26

# TABLE OF CONTENTS

**Page**


F. Coda's Reaction to Goodyear's '586 Patent ....................................27

1. Pre-Litigation, Hrabal Believed His Prior Publications Invalidated Goodyear's '586 Patent ......................................27

2. Coda Hoped to Attract Investors and a Development Partner with Its Patent Portfolio, and by Suing Goodyear for Patent Infringement ........................................................30

II. Procedural History ..........................................................................32

A. Coda's Complaint, Motion to Dismiss, and Appeal ..........................32

B. The Court Ordered Coda to Define the Alleged Trade Secrets .........33

C. Summary Judgment, *Daubert*, and Pre-Trial Proceedings ................34

D. Jury Trial ...........................................................................................36

E. Post-Jury-Trial Rulings .....................................................................39

SUMMARY OF ARGUMENT ......................................................................39

STANDARD OF REVIEW ...........................................................................43

ARGUMENT .................................................................................................43

I. THE DISTRICT COURT PROPERLY SET ASIDE THE JURY VERDICT AS TO CODA'S ALLEGED TRADE SECRETS ....................44

A. The District Court Correctly Treated the Question of Trade-Secret Definiteness as One for the Court ..........................................44

B. The District Court Properly Granted JMOL on Alleged Trade Secret 24 .........................................................................................46

1. Alleged Trade Secret 24 Is Indefinite .....................................46

2. Alleged Trade Secret 24 Was Not Secret ................................48

C. The District Court Properly Granted JMOL on Alleged Trade Secret 7 ...........................................................................................49

1. Alleged Trade Secret 7 Is Indefinite .......................................49

2. Goodyear Did Not Use or Disclose Alleged Trade Secret 7, Nor Was It Secret................................................................50

# TABLE OF CONTENTS

**Page**


D. The District Court Properly Granted JMOL as to Alleged Trade Secret 11 ....52

1. Alleged Trade Secret 11 Is Indefinite ....52

2. Alleged Trade Secret 11 Is Not Secret, and Goodyear Did Not Use or Disclose It ....53

E. The District Court Properly Granted JMOL as to Alleged Trade Secret 20 ....55

1. Alleged Trade Secret 20 Is Indefinite ....55

2. Alleged Trade Secret 20 Is Not Secret, and Goodyear Did Not Use or Disclose It ....56

F. The District Court Properly Granted JMOL as to Alleged Trade Secret 23 ....57

1. Goodyear Did Not Use or Disclose Alleged Trade Secret 23 ....58

2. Alleged Trade Secret 23 Was Not Secret ....59

II. THE DISTRICT COURT PROPERLY DENIED CODA'S REQUEST FOR A JURY INSTRUCTION ON REASONABLE ROYALTY DAMAGES ....60

III. THE DISTRICT COURT PROPERLY FOUND THAT CODA FAILED TO PROVE INVENTORSHIP AND PROPERLY DENIED CODA'S REQUEST FOR AN INJUNCTION ....63

A. The District Court Properly Found That Coda Did Not Prove Hrabal's Sole Inventorship of the '586 Patent ....63

B. The District Court Properly Denied Coda's Request for an Injunction ....67

IV. THE ISSUE OF LACHES IS NOT BEFORE THIS COURT ....67

V. THOUGH REMAND IS UNNECESSARY, REASSIGNMENT WOULD BE INAPPROPRIATE ....68

CONCLUSION ....70

CERTIFICATE OF COMPLIANCE ....71

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Alice's Home v. Childcraft Educ. Corp.*,
No. 09-299, 2010 WL 3448319 (Ohio Ct. App. 2010) ....................40, 44

*Armco, Inc. v. United Steel-workers of Am., AFL-CIO, Local 169*,
280 F.3d 669 (6th Cir. 2002) ....................68, 69

*AtriCure, Inc. v. Jian Meng*,
842 F. App'x 974 (6th Cir. 2021) ....................44

*Bianco v. Globus Med., Inc.*,
30 F. Supp. 3d 565 (E.D. Tex. 2014), *aff'd*, 618 F. App'x 1032
(Fed. Cir. 2015) (*per curiam*) ....................65, 66

*Biodex Corp. v. Loredan Biomedical, Inc.,*
946 F.2d 850 (Fed. Cir. 1991) ....................68

*Bowling v. Pfizer, Inc.*,
102 F.3d 777 (6th Cir. 1996) ....................61

*Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*,
53 F.4th 368 (6th Cir. 2022) ....................50, 51, 52, 56

*Cicena Ltd. v. Columbia Telecomms. Grp.*,
900 F.2d 1546 (Fed. Cir. 1990) ....................67

*Dana-Farber Cancer Inst., Inc. v. Ono Pharm. Co.*,
964 F.3d 1365 (Fed. Cir. 2020) ....................43

*Eolas Techs., Inc. v. Microsoft Corp.*,
457 F.3d 1279 (Fed. Cir. 2006) ....................68, 69

**TABLE OF AUTHORITIES**

**Page**

*Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*,
730 F.3d 494 (6th Cir. 2013) ....................................................................51

*IDX Systems Corp. v. Epic Systems Corp.*,
285 F.3d 581 (7th Cir. 2002) ....................................................................44

*In re Saffady*,
524 F.3d 799 (6th Cir. 2008) ....................................................................69

*King v. Ford Motor Co.*,
209 F.3d 886 (6th Cir. 2000) ....................................................................61

*Kitchen v. Chippewa Valley Sch.*,
825 F.2d 1004 (6th Cir. 1987) ..................................................................65

*Kusens v. Pascal Co.*,
448 F.3d 349 (6th Cir. 2006) ....................................................................43

*Micro Chem., Inc. v. Lextron, Inc.*,
318 F.3d 1119 (Fed. Cir. 2003) ................................................................69

*Olaplex, Inc. v. L'Oréal USA, Inc.*,
855 F. App'x 701 (Fed. Cir. 2021) .....................................................44, 45, 46

*Sagan v. United States*,
342 F.3d 493 (6th Cir. 2003) ...............................................................68, 69

*Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*,
264 F.3d 1344 (Fed. Cir. 2001) ................................................................66

*ScentSational Techs. LLC v. PepsiCo, Inc.*,
773 F. App'x 607 (Fed. Cir. 2019) ............................................................66

*SmithKline Beecham Corp. v. Apotex Corp.*,
439 F.3d 1312 (Fed. Cir. 2006) ............................................................passim

# TABLE OF AUTHORITIES

**Page**

*TLS Mgmt. & Mktg. Servs., LLC v. Rodríguez-Toledo*,
966 F.3d 46 (1st Cir. 2020) (Dyk, J.)....................44

*United States v. Johnson*,
480 F. App'x 835 (6th Cir. 2012)....................43

*UOP LLC v. Exterran Energy Sols., L.P.,*
No. 4:21-cv-2804, 2021 WL 8016712 (S.D. Tex. Sept. 28, 2021)....................49, 52

*Waymark Corp. v. Porta Sys. Corp.*,
245 F.3d 1364 (Fed. Cir. 2001)....................67

*Whitserve, LLC v. Computer Packages, Inc.*,
694 F.3d 10 (Fed. Cir. 2012)....................51

*Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*,
513 F. Supp. 1100 (E.D. Pa. 1981)....................2

**STATUTES**

28 U.S.C. § 2106....................68

35 U.S.C. § 256....................32

Ohio Rev. Code § 1333.61(D)(2)....................54

Ohio Rev. Code § 1333.63(A)....................42, 62

**OTHER AUTHORITIES**

Fed. R. Civ. P. 12....................32

Fed. R. Civ. P. 26....................62

Fed. R. Civ. P. 50....................3, 5, 36, 39, 43

Fed. R. Civ. P. 52....................39

## TABLE OF ABBREVIATIONS

The following abbreviations are used in this brief. Emphasis throughout the brief is added by Defendants-Appellees unless otherwise noted.

| Abbreviation | Term |
|---|---|
| (__:__) | patent column and line numbers, or transcript page and line numbers |
| CodaBr.__ | Citation to Corrected Opening Brief of Plaintiffs-Appellants, *Coda Development s.r.o. v. Goodyear Tire & Rubber Co.*, No. 23-1880 (Fed. Cir. Oct. 18, 2023), ECF No. 15. *E.g.*, CodaBr.9 is the page numbered 9 of ECF No. 15. |
| Benedict | Dr. Robert Benedict |
| Coda | Coda Development s.r.o., Coda Innovations s.r.o., and Frantisek Hrabal, collectively |
| Goodyear | The Goodyear Tire & Rubber Company |
| Hrabal | Frantisek Hrabal |
| Losey | Robert Losey |
| GM | General Motors |
| SAE | Society of Automotive Engineers |
| self-inflating tire | SIT |
| TS7 | Coda's alleged trade secret no. 7 |
| TS11 | Coda's alleged trade secret no. 11 |
| TS20 | Coda's alleged trade secret no. 20 |
| TS23 | Coda's alleged trade secret no. 23 |
| TS24 | Coda's alleged trade secret no. 24 |
| 2007 PCT | Coda's PCT (Patent Cooperation Treaty) application WO 2007/134556, titled "A chamber of a peristaltic |

| | |
|---|---|
| | pump for tire pressure adjustment" and published November 29, 2007 |
| 2009 PCT | Coda's PCT application WO 2009/103252, titled "A device for adjustment of pressure in tires" and published August 27, 2009 |
| '586 patent | U.S. Patent No. 8,042,586 |
| '254 patent | U.S. Patent No. 8,113,254 |
| '371 patent | U.S. Patent No. 8,852,371 |
| Ellmann | U.S. Patent No. 7,225,845 |
| Sheppard | U.S. Patent No. 3,304,981 |
| Lindner | Sweden Patent No. 183,890 |

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Defendants-Appellees The Goodyear Tire & Rubber Company and Robert Benedict are not aware of any case pending in this or any other court or agency that will directly affect or be directly affected by the Court's decision in this case.

## INTRODUCTION

Two basic principles resolve this appeal and compel affirmance: *One*, a trade secret must actually be a secret, and not disclosed in patents, articles, or publicly available prototypes. *Two*, a matter of Ohio law and compelled by the district court's pretrial orders in this case, is that a trade secret must be defined with sufficient particularity to allow the court to apply the criteria for trade-secret protection and determine whether there has been a misappropriation.

Coda and its principal, Frantisek Hrabal, ran roughshod over these two requirements throughout this case. Hrabal claimed to have invented a self-inflating tire ("SIT"). He published articles, gave industry presentations, sought patents, and maintained public websites with a video of his prototype tire—disclosing painstaking detail about his work. All this was in the public sphere when Coda and Goodyear met in 2009 to discuss a possible business relationship.

Before their first meeting, the parties signed a nondisclosure agreement ("NDA") that contained a provision allowing Coda to identify any orally-conveyed confidential information after-the-fact. Coda claims to have disclosed only oral trade secrets at their meetings, but there is no contemporaneous documentation of any "confidential" disclosures. At a second meeting that year, Coda showed Goodyear its nonconfidential prototype but told Goodyear before that meeting to "please understand there is not much more to see than what is on our website."

The first list of "potential" trade secrets Coda ever created was not compiled until *after* this lawsuit was filed. And it was not compiled by anyone present at the 2009 meetings or even involved with Coda at the time. Rather, it was created by Daniel Jackson, an investment banker who had taken an equity position in Coda in the interim and was seeking to monetize his investment through this lawsuit.

This was the impossible quandary that Coda and its lawyers faced trying to achieve Jackson's monetization goal: Hrabal's ideas, such as they were, had all been disclosed through Coda's many patents, articles, presentations, and websites. Further, no one—not Goodyear, not Coda or its licensees, nor any other tire manufacturer—ever commercialized a self-inflating tire. So no profits or royalties could come from suing on Coda's patents. Coda thus pivoted to accusing Goodyear of stealing trade secrets and appropriating them into Goodyear patents—a challenging strategy given all of Hrabal's public disclosures.

The post-complaint list made by Jackson (the banker) was only the starting point in what became a years-long effort of what the late Judge Becker described in an analogous context as "trying to nail jelly to the wall." *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 513 F. Supp. 1100, 1207 (E.D. Pa. 1981). Pre-trial and during trial, Judge Lioi repeatedly sought to have plaintiffs, consistent with the requirements of Ohio trade-secret law, as well as her own prior procedural rulings, identify their lengthy list of trade secrets with particularity, yet plaintiffs repeatedly

framed their claimed secrets in vague, often subjective terms. Then, when counsel had to explain those alleged secrets to the court, they often—indeed, almost always—defined them using different, even more vague, uncertain terminology. The result was that Coda's "secrets" were an ever-moving target, indicative that the case was a lawyers' word game, not a serious dispute over a real set of actual trade secrets.

After seven-and-a-half hours of argument on Goodyear's Rule 50(a) motion, the district judge thinned the trade secrets that went to the jury but warned plaintiffs that even the ones that survived might still be at risk post-verdict. And indeed, on Goodyear's Rule 50(b) motion, Judge Lioi properly ordered judgment of no liability.

Judge Lioi gave Coda every opportunity to prove a coherent trade-secret case and define particular trade secrets—and every fair warning about the consequences of not doing so. The judgment should be affirmed.

## COUNTERSTATEMENT OF THE ISSUES

1. Whether the district court properly granted JMOL of no misappropriation of Coda's alleged trade secrets 7, 11, 20, 23, and 24, based on Coda's failure to define its alleged trade secrets with particularity and Coda's failure to present sufficient evidence on which a reasonable jury could conclude that Coda possessed the alleged trade secrets, that its alleged secrets were not

generally known or readily ascertainable, that Coda disclosed them to Goodyear, or that Goodyear used or disclosed them.

2. Whether the district court abused its discretion by declining to give a reasonable-royalty damages instruction where Coda and its expert sought only actual damages, and not a reasonable royalty "in lieu of" actual damages under Ohio law.

3. Whether the district court properly found that Coda failed to establish, by clear-and-convincing evidence, that Hrabal is the sole inventor of every claim in the '586 patent and properly denied Coda's injunctive- and declaratory-relief requests.

4. Whether this Court should address laches when the district court determined that the issue "need not be addressed."

5. Whether Coda has made the extraordinary showing compelling reassignment of this case to a different judge in the event of remand.

## COUNTERSTATEMENT OF THE CASE

Coda's original complaint asserted seven state-law claims (including one trade-secret-misappropriation claim), one Lanham Act claim, and 13 correction-of-inventorship claims on 12 Goodyear patents. In response to Goodyear's discovery requests, Coda, after resistance and judicial intervention, eventually set forth 27 trade secrets it claimed Goodyear had misappropriated. Before trial, Coda lost on

or dropped almost all of its claims; by trial, it was asserting only 17 trade secrets and inventorship claims on two patents. The court removed five more alleged secrets on Goodyear's Rule 50(a) motion, sending 12 to the jury. The jury found against Coda on seven of those 12, found five misappropriated, and awarded damages. Post-trial, Judge Lioi granted JMOL to Goodyear on the remaining five trade secrets and found Coda failed to prove its inventorship claim on the '586 patent (Coda had dropped its other inventorship claim).

Coda's case is now down to the '586 patent and the five alleged secrets for which Coda says the court should not have granted JMOL. One of those trade secrets (TS24) refers to the pump location being "in the sidewall close to, and above, the rim where the tire cyclically deforms in response to deformation"; it was asserted by Coda to be "foundational" because it related to the location of the reinflation pump within the tire, and, along with five other pump-location trade secrets (whose loss Coda does not challenge on appeal), formed the basis for Coda's alleged damages.

## I. Factual Background

### A. Self-Inflating Tires

Concepts for self-inflating tires have been published for over 100 years. The concept was disclosed in a patent as early as 1899. Appx06040. Many other examples of peristaltic-pump-driven self-inflating tire designs were published over

the past century. *E.g.*, Appx07408–07412 (Lindner, 1963); Appx07413–07416 (Sheppard, 1967).

In 2007, Ellmann disclosed a self-inflating tire with a peristaltic pump tube ("hose") positioned in a wheel-rim groove ("duct") between the tire sidewall and rim. Appx07401–07407; Appx07203–07204; Appx07405 (2:19–24); Appx17454–17459 (2274:9–2279:3). In alternative embodiments, a hollow duct was formed in the tire itself; the duct received (or formed) a hose-type structure with a closed cross-section. Appx07404 (2:24–35).

Thus, by 2009, the idea of using a tube or chamber in a tire that is progressively squeezed by deformation of the tire as it rolls, to pump air into it, was neither new nor secret.

### B. Coda Publicized and Patented Its Self-Inflating Tire Ideas

Hrabal began working on self-inflating tire designs in the early 2000s. Appx01946. He published his ideas on websites, in articles, and at tire-industry conferences. He also disclosed his ideas in numerous patent applications and peddled his patents to nearly every tire maker in the world. But he never succeeded in commercializing a self-inflating tire.

### 1. Coda's Disclosures of Locating the Pump in the Sidewall Close to and Above the Rim

#### a. *Coda's 2003–2007 Website*

Hrabal published certain SIT ideas on the "EnTire" website he maintained from 2003 to 2007. Appx15798 (666:12–21). That website provided an animation showing peristaltic pumps located either in the tire sidewall (indicated by added red arrows) or the tread area (circled in bright green) and illustrating how those pumps would compress as the tire sidewall cyclically deforms when rotating. Appx23860–23861; Appx15798–15799 (666:14–667:5).[1]



Appx23860–23861 (red arrows added). Hrabal admitted that this animation illustrates locating a pump in a tire sidewall close to and above the tire rim. Appx15799 (667:3–12) ("It's very close, but it's above the rim."). Hrabal disclosed the public website to Goodyear in 2003 and confirmed that Goodyear visited it. Appx15809 (677:2–15); Appx24089–24094. In 2013, Hrabal stated that

[1] Available at https://web.archive.org/web/20031007005238/http://www.selfinflatingtire.com/index.asp (last visited 1/19/2024).

this location is the same as the location of the pump in Goodyear's '586 patent. Appx24089.

**b. *Coda's 2008 Tire Technology Article***

Hrabal also published SIT ideas in an industry journal, *Tire Technology International 2008*. Appx23863–23867. Hrabal explained that "[t]he peristaltic tubing can be implemented in the tire wall . . . as a crevice in the tire sidewall." Appx23866. He disclosed that "[t]his could be accomplished by a simple design change in the sidewall, which, simplified, could be achieved by a modification of the mold in the normal tire production process." Appx23865. Hrabal's article shows a pump in the tire sidewall near and above the rim:



Figure 4: A closer look at the crevice in the tire wall and its sealing during wheel assembly. The pressure between tire and rim is up to 10 times more than the tire pressure

Appx23866 (red circle added, indicating pump location in the sidewall close to and above the wheel rim); *see also* Appx15755–15757 (623:18–625:12), especially Appx15757 (625:9–12) ("Q. So locating a peristaltic pump in the tire sidewall near

the rim in an area where it cyclically deforms was not a trade secret? A. This is public."); Appx15792 (660:18–19) (admitting that this location is "over the rim, but it's on the rim at the same time"). The article also described an alternate pump embodiment separate from the tire, placed between the tire and rim (his "flap tube" solution):

> It is also possible to create the tubing outside the tire wall as a separate unit, placed between the rim and the tire. In that case the tire would just lean on the tubing and enclose it by its deformation . . . . Such a setup was used during prototype testing.

Appx23865.

#### c. *Coda's 2007 PCT Application*

In 2007, Coda's PCT application WO 2007/134556 published. Appx00252–00296. It disclosed many of the ideas Coda has claimed as trade secrets, including placing a pump chamber in the sidewall close to and above the wheel rim.

The 2007 PCT detailed how Hrabal's peristaltic pump worked by cyclical deformation of the rolling tire, disclosing various locations for the pump. Appx00266–00267 (13:29–14:7). The pump, "chamber 1," can be "part of the tire or adjacent to the tire wall and is connected with the internal space of the tire at one end and with the exterior environment at the other end." Appx00269 (16:3–6).

Figure 2(b) shows an "ancillary structure 6" (or "flap tube") between the tire and rim, which contains the pump.

FIG. 2B




The 2007 PCT is not limited to locating the pump in a separate flap between tire and rim. Like the *Tire Technology* article, it explained that the pump chamber can be located within the tire sidewall itself, among other locations:

- "Although the chamber 1 in the examples is placed mainly to the tire 4 bead, it can also be created . . . anywhere else in the wall or at the wall of the tire 4, so, for example, even at the tread of the tire 4." Appx00271 (18:2–6).
- "[C]hamber 1 . . . can be created at any place in the wall of the tire 4 or in its vicinity, so for example, in the tread or side wall of the tire 4, too," so long as "[t]he chamber 1 is located at the point with variable deformation forces." Appx00274 (21:1–6).
- "Accordingly, the chamber 1 can be created in the wall of the tire 4, too." Appx00275 (22:6–7).

The options included placing the pump chamber in a "lug boss," as shown in Figure 2(c).




Appx00289. A lug boss is a thickened area of the tire sidewall, if there is not enough space for the pump in the "commonly produced" tire wall. Appx00271 (18:27–32). Hrabal admitted at trial that the lug boss is part of the tire sidewall. *E.g.*, Appx15756 (624:13–14) ("Q. [T]he lug boss is in the tire sidewall? A. The lug boss is part of the tire sidewall."); Appx15774 (642:7–11) ("Q. [I]n the lug boss rendition, that's not called an ancillary structure. It's part of the tire sidewall? A. Yes."). He also testified that "[t]he lug boss is on the rim near and above the rim." Appx15795 (663:2); Appx15792 (660:18–19) (the lug boss is "over the rim, but it's on the rim at the same time"); *id.* (660:9–13).

#### d. *Coda's Prototype Tire*

Hrabal also published a prototype-tire testing video on Coda's website to market his ideas. Appx15737–15739 (605:16–607:19); Appx23862; Appx23868; Appx24078. The video states that "the crucial part" is the peristaltic pump tube placed between the tire and rim.










Appx23868. It explains that, while the prototype has the pump tube between the tire and rim, "for the manufacturing process, it can be replaced by a simple chamber designed as ***an integral part of the tire wall***, which is easy to produce and inexpensive," highlighting a cross-section of a pump tube close to and above the rim:



Appx23868.

**e. *Coda's Public Presentations***

In 2008, Coda presented its SIT concepts at an SAE World Congress in Detroit, where it won an award for its published and patented ideas. Appx15526 (394:10–18); Appx15746 (614:8–10); Appx15773 (641:1–7). Hrabal handed out thumb drives containing information about Coda's SIT technology. Appx23862; Appx06394–06404. In one presentation, Coda stated that its SIT had a "tire-integrated chamber" and that the "SIT system . . . integrates a tube chamber ***into the tire wall***." Appx06396–06399. The presentation showed the pump chamber (green semi-circle) close to and above the wheel rim:



Appx06399 (red arrow added); *see also* Coda's February 2009 public presentation in Hamburg, disclosing alternative locations for the peristaltic pump chamber, as "part of" either the tire or the rim, or "in-between," and that the pump can be

"created as part of [the] tire side wall or [the] tire wall contains only a 'seat' for separated tubing." Appx15764 (632:6–15); Appx23962.



### 2. Coda's Disclosures of Pump Configurations

Coda's 2007 PCT also disclosed extensive information regarding pump design and various examples having different sizes, shapes, and dimensions. Appx00268 (15:16–18).




Appx00290. This included an elliptically-shaped pump chamber (*e.g.*, Figures 3d–f), a "tubeless" pump chamber (*e.g.*, Appx00271 (18:27–29)), and cross-section designs that minimize stress and abrasion (*e.g.*, Appx00272 (19:23–33); Appx00276 (23:9–11)). *See also* Appx23962 (Hamburg presentation disclosing that pumps can be short or long); Appx15768–15679 (636:23–637:4) (Hamburg

presentation disclosing elliptical pump chambers); Appx (801:6–25) (Hrabal: the flap solution is a tubeless pump chamber).

### 3. Coda Discloses the Circulating and Non-Circulating Pump Ideas of TS20

#### a. *Coda's 2009 PCT Application*

Coda's PCT application WO 2009/103252, which published in 2009, disclosed numerous ideas for pressure-regulating devices in a self-inflating tire. Appx24021–24063. The recirculating concepts Coda claimed in TS20 were published in the 2009 PCT.

The 2009 PCT describes several embodiments of Hrabal's pressure-regulator idea, including a three-way valve in a recirculating pump. Figures 1(a)–(b) illustrate his concept of a SIT regulator:




Appx24056. The 2009 PCT described the regulator as having a three-way valve V; explained how it controls recirculation of air within the tire P; described how

the check valve JV works; and explained how the system switches between inflation (Fig. 1(b)) and recirculation (Fig. 1(a)) modes. Appx24029–24031 (8:14–10:3).

### b. *Coda's Hamburg Presentation*

The 2009 Hamburg presentation also disclosed Hrabal's idea for the pump to internally circulate air when the managing valve is closed (not inflating the tire).




Appx23960. It additionally disclosed Hrabal's non-recirculating idea from TS20, using dead space within the pump tube to regulate pressure, locating the check valve at either end of the pump ("Cycle X" versus "Cycle Y"). Appx16258 (1126:19–25).




Appx23970.

### C. Goodyear Was Interested in SIT, but Learned That Coda Did Not Have an Actual Self-Inflating Tire

In March 2008, a GM representative contacted Coda after visiting Coda's website and reading Coda's SIT publications. Appx23549. GM was interested in using Coda's SIT in the Chevy Volt electric vehicle it planned to launch in 2010. Appx15528 (396:4–16). The representative contacted Goodyear, passed along a CD and other information from Coda, Appx23544, and encouraged Goodyear to meet with Coda. Appx15529 (397:12–19).

Based on Coda's publications, Goodyear believed Coda was only 12 months away from being production-ready. Appx16928 (1749:1–15); Appx17011–17012 (1832:12–19, 1833:2–6). If Coda actually had a fully functional prototype, it could

allow a manufacturer to immediately jump into development. Appx16929 (1750:5–10). In December 2008, Benedict gave his supervisor information about SIT technology, including Coda's SAE presentation, Appx21755–21760, describing it as "a tire integrated pump." Appx21757. Goodyear then contacted Coda to schedule a meeting. Appx15530 (398:13–18).

### 1. The Parties' NDA

Prior to meeting, the parties executed an NDA. Appx23508–23509. It stated: "All Confidential Information disclosed in documentary or tangible form shall be marked 'Confidential.'" Appx23508. It further provided:

> In the case of disclosures in non-documentary form made orally or by visual inspection, the discloser shall have the right, or, if requested by the recipient, the obligation to confirm in writing within sixty (60) days after the disclosure is made the fact and general nature of such disclosure.

Appx23508–23509.

### 2. The January 2009 Meeting

Goodyear and Coda met in January 2009 for the first of two meetings. Hrabal presented the same information to Goodyear that he had presented at the 2008 SAE convention and disclosed in his patent applications. Appx15538 (406:13–25). Hrabal gave a slide presentation virtually identical to the one he would give publicly in Hamburg a month later. Appx15716–15717 (584:22–585:11); *compare* Appx21600–21655 *with* Appx23930–23973. Hrabal showed Goodyear the prototype video but not the prototype itself. Appx15539 (407:1–10).

Goodyear and Benedict were skeptical. They requested a second meeting to view Coda's facilities and prototype. Appx17017–17018 (1838:16–1839:5); Appx21178–21179; *see also* Appx15540 (408:19–25). Goodyear drafted an internal email summarizing the first meeting, calling Coda's technology "not fully validated," noting "no demonstration [was] made if it will operate properly under aging or real life constraints," and concluding that "it looks that [Coda's] SIT concept is not fully accomplished." Appx20161.

### 3. The June 2009 Meeting

Goodyear and Coda met again in June. Goodyear wanted to visit Coda's facilities to evaluate Coda's capacity to quickly develop a SIT. Appx17028 (1849:5–10). So a Goodyear engineer requested "a technical readiness evaluation at your premises in Prague, in order to physically judge the concept feasibility on-site and to decide whether we will start a development project or not." Appx21179. Within Coda, though, Hrabal was "making fun of" Goodyear's request, because he knew Coda "did not have any facilities for Goodyear to visit." Appx17409–17410 (2229:23–2230:9).

Coda responded: "[W]e finished our conceptual testing more than one year ago," so Coda "will not be able to demonstrate the prototype under load." Appx21178. Coda also sought to further tamp interest in visiting Coda's

(nonexistent) facilities by telling Goodyear: "[P]lease understand there is not much more to see than what is already on our website." Appx21178.

With no Coda "facilities" to visit, Goodyear and Coda instead met at a hotel. Hrabal showed his prototype, but the pump tube in Coda's prototype was not actually in the tire sidewall. Appx15740 (608:16–610:1). Hrabal explained to Goodyear that his prototype was just a normal tire on which he had glued epoxy extensions on the tire sidewall and the wheel rim, with a hose between the extensions to act as the peristaltic pump, because he had no capability to manufacture a tire with a pump chamber in it. Appx15464–15467 (332:11–333:2, 335:4–10); Appx16047 (915:12–17).

Goodyear had believed the prototype was actually pumping air into the tire. Appx17032 (1853:7–9). The June 2009 inspection proved otherwise—it was just pumping air into a pressure sensor, not the tire. Appx15742–15743 (610:14–611:7); Appx17032 (1853:5–18). Goodyear realized Coda was nowhere near 12 months away from being production-ready—it had no self-inflating tire and no capability to even develop a production prototype. Appx17034 (1855:2–5, 11–13). Coda was a house of cards.

Hrabal claims to have orally disclosed his "secret" "tube in groove pump location" in the tire sidewall at this June meeting by "point[ing] to the location of that extension which is on the tire sidewall." Appx15469–15470 (337:20–338:4).

He claims he told Goodyear, "if I was a tire guy, I would just shift it into the tire sidewall." Appx15561 (429:9–17). That is the extent of Coda's alleged disclosure of a secret pump location to Goodyear.

There is no contemporaneous written record of this. Appx15743 (611:8–11). No other meeting attendee confirmed Hrabal's claim. The only other Coda representative at that meeting who testified, Ladislav Szabo, did not recall Hrabal pointing to any specific area of the tire. Appx17417 (2237:1–16). Nor did he recall Hrabal disclosing any "secret" pump-tube location—or even discussing any Coda secrets at all. Appx17418 (2238:6–16). And Coda never availed itself of the NDA's confirmation procedures for oral disclosures. Appx23508–23509.

Coda contends only that trade secrets were orally disclosed to Goodyear, not in writing. Appx15572–15573 (440:24–441:11); Appx15727 (595:5–24); Appx15735 (603:11–13). The slideshow Coda presented to Goodyear disclosed no secrets. Appx15727 (595:5–24). The prototype was on Coda's public website and not marked "confidential." Appx15730 (598:1–4); Appx15737–15738 (605:16–606:1); Appx23868. None of the physical items Hrabal displayed at the meetings was marked "confidential." Appx15730 (598:1–4).

#### 4. Goodyear Decides Coda Is Not a Viable Partner

Following the June meeting, Benedict reported to Goodyear that he saw no Coda facilities and no functional prototype, and that Hrabal's prototype was not

actually a self-inflating tire, because it had no air passage to transport air into the tire itself. Appx16942 (1763:15–19); Appx21761. He reported that Coda's prototype would never work, because it was "very crude" and "looked like something you would cobble together in your garage." Appx16066–16067 (934:20–935:6).

Benedict concluded that Coda "actually had less than I thought," and that Goodyear would get "no useful development help from Coda." Appx21761; Appx24007; Appx17017–17018 (1838:16–1839:1). He recommended that Goodyear instead develop the best self-inflating tire technology on its own, mindful that Coda had pending patent applications, and that Goodyear should closely monitor the intellectual property it used. Appx21761.

### D. Goodyear's Air Maintenance Tire (AMT) Program and the '586 Patent

Goodyear's self-inflating tire project was called AMT. It resulted in the '586 patent, and many others. At the outset, the project was regarded as a "longshot" (Appx16950 (1771:1)), and Goodyear never did produce a commercially acceptable AMT product. Goodyear dropped the program in 2018.

### 1. The ’586 Patent

Goodyear filed the ’586 patent application in December 2009, naming Benedict and former defendant Losey as inventors.[2] Appx00065–00084. Coda contends that the ’586 patent disclosed TS24 and that Hrabal is the true, sole inventor of that patent.

The ’586 patent claims require (1) a first tire sidewall with “at least one bending region” having “a bending strain neutral axis, a compression side of the neutral zone, and an elongation side of the neutral zone”; (2) “a sidewall groove positioned within the compression side of the neutral axis of the one said bending region of the first tire sidewall”; and (3) “an air tube positioned within the sidewall groove in contacting engagement with opposite groove surfaces.” Appx00083 (10:36–46). The ’586 patent thus defines the pump-tube location by compression zones, not in relation to the wheel rim.

The patent teaches that the bending strain in a rolling tire sidewall “causes the radius of the curvature within certain such sidewall regions . . . to bend to a greater extent.” Appx00083 (9:12–19). It states, referring to Figure 9(a), that such bending regions “will have a neutral axis 180 that is not under strain; a compression side 182 of the neutral axis . . . that is under compression; and an

[2] Coda sought and obtained dismissal of Losey as a defendant, with prejudice, before trial. Appx05906–05910.

elongation side 184 of the neutral axis . . . that is under elongation." Appx00083 (9:19–26). It explains that the tube-and-groove, item 188, "should be further placed within the compression side . . . at a location farthest removed from the neutral axis 180, for such a location will experience the greatest compression strain." Appx00083 (9:36–40).




FIG−9A

Appx00077.

The '586 patent also teaches that grooves (items 200, 202, and 204 in Figure 9(b) below) can be located in the compression side of the neutral axes of bending regions at various locations. Appx00083 (9:48–67).




FIG—9B

Appx00078.

### 2. Goodyear's AMT Projects Failed

Goodyear started an AMT project for passenger vehicles in Europe in 2010, called "Built-In." Appx24195. This project did not use the '586 patent's tube-in-groove design, instead using a pump chamber formed integrally in the tire. Appx16451 (1319:1–11). The project encountered many problems and was closed in 2014. Appx17283 (2103:12–17).

Goodyear also ran two AMT projects in Akron for commercial truck tires. The first closed in 2016; the other in 2018. Despite nine years of work, Goodyear never commercialized a self-inflating tire. Appx16580 (1548:20–24).

### E. Coda's SIT Efforts Failed

Starting around 2004, Coda attempted to license or commercialize its SIT concept with over 60 tire companies and other entities, including Bridgestone,

Michelin, Continental, Pirelli, and Yokohama. Appx15894–15897 (762:4–765:19); Appx06630–06634. Coda's efforts failed; no one has commercialized a tire using Coda's SIT technology. Appx15895 (763:1–7).

In 2012 an Indian tire company, TVS Srichakra, entered into a joint-development agreement with Coda, paying $250,000 for a sublicense to Coda's SIT. Appx15690 (558:15–22); Appx15904–15914 (772:2–4, 774:10–775:2, 782:2–8); Appx24140–24166. Despite the license, TVS never commercialized Coda's SIT. Appx15895 (763:15–19); Appx15915 (783:15–18).

### F. Coda's Reaction to Goodyear's '586 Patent

Prior to litigation, Coda asserted that its patents and publications dominated and anticipated the '586 patent, not that Hrabal should be an inventor on it, nor that it disclosed Coda trade secrets.

#### 1. Pre-Litigation, Hrabal Believed His Prior Publications Invalidated Goodyear's '586 Patent

Hrabal learned about Goodyear's first AMT applications, including the '586 application, shortly after they published in 2011. Appx24102–24103; Appx15852 (720:10–721:3). His reaction was "I believe that this patent do[es] not harm us" and "I believe they clearly fall under our patent." Appx24102. He believed Goodyear's patents "either have lack of novelty or inventive step and their patent should not be granted," but, if granted, Goodyear "will have to use our patent." Appx24102; *see also* Appx24167–24168. Hrabal claimed that the '586 patent

application shows that Goodyear "works on the solution which falls under our patent, i.e. they work for us. If this is the case do we want to limit them? Attacking their patent may cause change of their direction so they will primarily develop other solution." Appx24102; Appx15849 (717:15–23). Others at Coda agreed, stating, "I do not think that this is bad news for us" and that Goodyear's AMT "is a product that has a future and, therefore, our patents have value." Appx24098.[3]

In 2013, Hrabal created a claim chart analyzing the '586 patent's claims. Appx24076–24094. He mentioned no trade secrets; rather, for each claim, Hrabal either (1) opined it was anticipated by Coda's publications; or (2) confessed he did not understand it. *Id.*

Regarding claim 1 of the '586 patent, Hrabal wrote that Coda's 2003–2007 website "shows the location of [the] tire tubing" and "[i]f you make [a] 'seat for separated tubing' [as disclosed in the 2009 Hamburg presentation] in [the] tire sidewall in this location, then it becomes what is described in Goodyear Claim 1." Appx24089. He reproduced an image from that website showing that pump location in the tire sidewall:

[3] At trial, Hrabal claimed these prior admissions were meant to encourage his team when he really believed he was "petrified," but nothing corroborated his self-serving, after-the-fact testimony. Appx15848–15849 (716:3–717:11).




*Id.*; *see also* Appx23962 (Hamburg presentation); Appx23860–23861 (website animation). Hrabal admitted at trial that the pump tube in the animation is close to and above the rim. Appx15799 (667:9–12) ("Q. . . . [T]hat peristaltic pump there would be above the rim, right? A. It's very close, but it's above the rim, yes.").

Hrabal also analyzed claim 2 of the '586 patent:

> 2. The tire assembly of claim 1, wherein the air tube and the sidewall groove are located within a sidewall region of the first tire sidewall above an upper boundary of the rim

Appx24079; Appx00083 (10:55–57). Hrabal concluded that "any chambers in our patent can be considered above an upper boundary of the rim (at least partially), but this 3h is there in full," pointing to an annotated Figure 3(h) from his 2007 PCT:

Fig. 3. h)




Appx24079. Thus, Hrabal admitted, pre-litigation, that he publicly disclosed a pump in the tire sidewall, "close to and above the wheel rim," before he met with Goodyear in 2009. Rather than claiming Goodyear published his trade secrets in the '586 patent, Hrabal concluded everything claimed in Goodyear's patent was already disclosed in his own publications.

#### 2. Coda Hoped to Attract Investors and a Development Partner with Its Patent Portfolio, and by Suing Goodyear for Patent Infringement

Coda always emphasized to potential investors and partners that its SIT technology was patented. That was the first thing Hrabal said in his 2008 *Tire Technology* article. Appx23863 ("The patented self-inflating (SIT) system by Coda Development is a major advance in solving tire-pressure concerns."). Coda touted its "patent rights related to the SIT technology" in the 2009 Hamburg presentation. Appx23954. It did the same in soliciting tire companies' partnerships in 2009 (Appx08060), and, after Goodyear's '586 patent application published in 2011, Coda told its licensee, TVS, that Goodyear "will need [a]

license from Coda if SIT technology is part of their solution" because "Coda was the first player filing for patents" in this area. Appx23535. Hrabal even told Coda investor Szabo that Coda's patents covered what Goodyear was doing. Appx17405–17406 (2225:20–2226:11); Appx17421–17422 (2241:17–2242:20).

In 2014, investor Jackson noted that Coda's patent portfolio was its major asset, and that a "[p]atent infringement claim [against Goodyear] reduces [the] risk of losing money." Appx23810. Jackson's perspective was "the jackpots here lie in the [Goodyear] litigation and licensing deals with major tire manufacturers." Appx24172; Appx16232 (1100:6–7). Regarding the "jackpots" of suing Goodyear for patent infringement, Jackson advised "wait[ing] until things ripen": "[A]n actionable claim has not yet arisen because [Goodyear] has not yet launched its AMT product and it must be a commercial success to enable material damages." Appx24172.

Of course, Goodyear never launched an AMT product, so a patent-infringement suit never "ripen[ed.]" And investor Jackson's patience was not infinite. So in 2015, Coda turned to a new theory: suing Goodyear for stealing trade secrets and putting them into Goodyear's patents. This theory had considerable challenges, though—Hrabal was already on record as saying his prior publications disclosed everything in Goodyear's '586 patent. *See supra*, pp. 28–30. And he hadn't said word one to Goodyear—or anyone—about trade secrets.

So, three months *after* filing this suit, Jackson set his hand to crafting a list of "potential" trade secrets, "to put a rocket under the lawyers." Appx24451–24452; Appx16237–16238 (1105:25–1106:4). Hrabal had little recollection of making such disclosures; as Jackson wrote, "For many of these, the content of disclosure to [Goodyear] is uncertain." Appx24451.

## II. Procedural History

### A. Coda's Complaint, Motion to Dismiss, and Appeal

Coda filed its original complaint in August 2015. Appx00158–00196. It pleaded 13 correction-of-inventorship claims under 35 U.S.C. § 256 on 12 Goodyear patents, seeking to add Hrabal as sole or joint inventor. Appx00174–00180. It also pleaded seven state-law claims and a Lanham Act claim. Appx00181–00193. Goodyear moved to dismiss all claims under Rule 12(b)(6); the court granted the motion and entered judgment. Appx01082–01110.

Coda sought leave to file an amended complaint, asserting three claims for correction of inventorship on six Goodyear patents and an Ohio-law trade-secret claim. Appx01111–01147. The proposed amendment dropped all other claims originally pleaded, including on eight of the original 12 patents. Appx01659–01688. The court denied the motion as futile. Appx01769–01783. Coda appealed; this Court remanded to allow Coda to amend its complaint. Appx01816–01817.

### B. The Court Ordered Coda to Define the Alleged Trade Secrets

On remand, Coda filed its amended complaint. Goodyear served interrogatories asking Coda to define with particularity each alleged trade secret at issue and to set forth in detail everything said in the 2009 meetings. Coda refused to provide full and complete answers.

Goodyear moved to compel. The court granted the motion and ordered Coda to provide "a complete list of the trade secrets (with particularity) that they claim were orally disclosed to defendants, including detail as to when plaintiffs conceived of and developed each of the features in each trade secret." Appx02343. The court also "made clear that additions to this list at a later time will be permitted only upon showing of an exceptional reason to do so." Appx02343. The court emphasized that "Coda's claims 'are based entirely on alleged oral disclosure of trade secrets . . . over the course of a few hours of discussion in two meetings'" and that "'[n]o written materials containing trade secrets were given to [d]efendants in the meetings.'" Appx02345. The court expressly noted that "the danger of plaintiffs 'molding' their claims by way of subsequent supplementation of their original recollection of those two 2009 conversations is of particular concern." Appx02349.

Coda's initial amended interrogatory response listed alleged trade secrets for which the components of each were often connected by "and/or," effectively

making each secret a countless number of possible combinations (*e.g.*, connecting each element of TS11 with "and/or" resulted in at least 255 different combinations, and it was impossible to know what elements had to be included). Appx11408–11409. Following Goodyear's objection, Coda served a new list of 27 alleged secrets, with no "and/or" conjunctions between the required components of each trade secret.

Discovery proceeded with the 27 alleged trade secrets in place. On the eve of Goodyear's summary-judgment motion, Coda dropped 10 of the secrets from the case.

### C. Summary Judgment, *Daubert*, and Pre-Trial Proceedings

**Summary Judgment**. Goodyear moved for summary judgment on the 17 remaining alleged secrets on various grounds: (1) indefiniteness; (2) public disclosure by Coda, to the extent Coda had adequately described the trade secret; and (3) lack of proof of use or disclosure by Goodyear. The court denied the motion, but allowed that it might later grant JMOL. Appx10473.

**Goodyear's Damages *Daubert***. Goodyear moved to exclude Coda's damages expert, Webster, because her only damages theory was actual damages based entirely on speculation. Webster opined that but for Goodyear's alleged misappropriation, (1) Coda would have obtained patents claiming the trade secrets; (2) either Goodyear or Bridgestone would have entered into an exclusive patent

license with Coda, calling for royalties of $1 to $8 per tire sold; (3) either company would have commercially introduced and sold billions of dollars of licensed tires covered by the hypothesized patents through 2029; (4) either company would have also entered into sublicenses with other tire companies that would have yielded billions of dollars in additional sales; and (5) therefore Coda suffered actual lost licensing revenues of $80–$246 million. Appx07799–07801.

It was sheer fantasy: Coda made no showing that it could have patented any of its alleged secrets, particularly over all of the prior art (including Coda's own patents and publications); Goodyear and Coda never had any actual license discussions; and Coda's only agreements with other tire companies had no comparable terms and never resulted in commercialization of anything. No witness from Goodyear testified that it would have entered into such a license, and no one from Bridgestone or any other tire company testified in the case.

Coda opposed and initially argued that Webster's theory was both an actual damages theory and a reasonable-royalty theory. Coda argued that it qualified as a reasonable-royalty theory because, to arrive at either of the two agreements that would (supposedly) actually have been entered into, Webster did a *Georgia-Pacific* analysis of the negotiation she said would actually have occurred between Coda and either Goodyear or Bridgestone. Appx18949–18957 (131:8–17, 133:2–6, 138:13–14) ("We had Ms. Webster calculate it. So it would be the same

analysis.”); Appx18958 (138:15–22) (“The number would be the same” no matter if it’s actual loss or reasonable royalty). Coda’s argument became even more confusing when Coda’s counsel admitted that Webster had actually refused to offer a reasonable-royalty opinion. Appx18962 (142:1–8). Still, the court denied Goodyear’s motion. Appx14966; Appx18991.

**Coda’s *Daubert***. Coda moved to exclude opinions of Goodyear’s technical expert, based on Coda’s view that Ohio law did not require trade secrets to be definite, and that its trade-secrets list, though inadequately defined by itself, must be understood in view of its other interrogatory answers and amended complaint. Appx10671–10675. The court denied the motion because Ohio law requires trade secrets to be definite, and (per its prior orders) Coda’s list of secrets had to be complete without the need to refer to external information. Appx15301–15304; Appx15304 (176:7–8) (“You have to stay true to the definition that was given.”).

**Coda Dropped Claims**. Prior to trial, Coda dropped its correction-of-inventorship claims against four of the six Goodyear patents at issue in the amended complaint. Only the ’586 and ’254 patents remained.

### D. Jury Trial

The court held a two-week jury trial beginning September 6, 2022. Appx00009. Goodyear moved for JMOL under Rule 50(a) on the 17 trade secrets

at issue. *Id.* The court heard over seven-and-a-half hours of argument on that motion. Appx16910–16918; Appx17114–17265; Appx17731–17835.

**JMOL Under Rule 50(a)**. Coda's arguments demonstrated exactly the sort of morphing and re-shaping of the alleged secrets that Goodyear and the court feared would happen. Because Hrabal admitted that a pump close to and above the rim was disclosed publicly by 2009, Coda attempted to change TS24's location to: "in the conventional tire sidewall close to, and above but not on, the rim, where the tire cyclically deforms, without rim crush." Appx17741 (2550:11–13) ("What's important is that the peristaltic pump chamber is not in a conventional tire sidewall."); Appx17761 (2270:3) (distinguishing public disclosures because they "pinched against the rim"); *see also* Appx15788 (656:13–14) (distinguishing Coda's PCT "because it's crushing the peristaltic pump against the rim"). The court expressed its frustration at Coda's constant morphing. Appx17750 (2559:22–24) ("Where does it say that in trade secret 24 . . .?"); Appx17751 (2560:17–19) ("So this has been my frustration with this case since inception, that we keep morphing, morphing, morphing."); Appx17761 (2570:7–8) ("[W]here does it say to avoid crushing [against] the rim?"); Appx17763 (2572:16–23).

Prior to instructing the jury, the court granted JMOL on five of the 17 trade secrets as indefinite. Coda does not challenge those rulings. These five included four "foundational" trade secrets directed to pump location. Appx18916–18917

(96:17–97:9); Appx06793–06800. The court reserved decision on the remaining 12, stating that it "still has concerns regarding the definiteness of [those trade secrets]," and that "this is not the end of the road relative to whether these are definite enough to really even be trade secrets." Appx17841–17842 (2650:16–2651:19).

**Reasonable-Royalty Instruction**. The court declined to give a reasonable-royalty jury instruction because, having heard the evidence at trial, it was clear that Webster's damages theory was actual loss, not a reasonable royalty. Appx17854–17855 (2663:10–2664:1). The court found that the jury would have "no guidance" on how to determine a reasonable royalty based on the evidence submitted. The "plaintiffs, through Ms. Webster's report, made it very clear that they were pursuing an actual damage claim. I'm at this date finally taking them at their word because [that's] how the evidence was presented even at trial." Appx17855 (2664:2–6). While Coda contended that the evidence was the same, and reasonable royalty was just a different theory, *e.g.*, Appx17831 (2640:8–11), the court concluded that the two calculations would be different. Appx17855 (2664:9).

**Jury Verdict**. The jury found five asserted secrets (including TS16, another of the six "foundational" secrets) were not trade secrets. Appx17997. Of the remaining seven, it found two had not been misappropriated, five had, and awarded

$2.8 million in compensatory damages, rejecting Webster's damages theory, and a later-vacated punitive award. Appx17996–18002.

### E. Post-Jury-Trial Rulings

**JMOL**. The court granted JMOL under Rule 50(b) on TS7, 11, 20, 23, and 24 on multiple grounds. The court found four of the five (TS7, 11, 20, and 24) indefinite and, alternatively, had not been shown secret, and/or used or disclosed by Goodyear. The latter findings also applied to TS23.

**Inventorship**. The court found Coda failed to prove its claim of sole inventorship on the '586 patent by clear, convincing, and corroborated evidence, and that Coda abandoned any claim of co-inventorship. Appx00038. The court issued a 32-page decision with extensive factual findings and conclusions of law under Rule 52(a)(1). Appx00032–00063. On appeal, the sole error alleged by Coda is the court's conclusion that it was not bound by the jury verdict it vacated under Rule 50(b). CodaBr.51–52.

## SUMMARY OF ARGUMENT

Coda presents no basis for disturbing the district court's careful, soundly reasoned decisions.

**Trade-secret indefiniteness.** The court properly granted JMOL of indefiniteness of TS7, 11, 20, and 24. In each instance, the alleged secrets were described in such vague, even gelatinous terms that no reasonable fact-finder could

understand "precisely what aspects of" Hrabal's self-inflating tire ideas "constituted a protectable trade secret," which contravened Ohio trade-secret law. *Alice's Home v. Childcraft Educ. Corp.*, No. 09-299, 2010 WL 3448319, at *4 (Ohio Ct. App. 2010). *See* Appx02349.

TS24 vaguely claimed the optimal pump location as in the sidewall "close to" and "above" the rim where it deforms, allowing Coda's lawyers to try to morph that alleged secret by adding all sorts of requirements—like whether TS24 was speaking about a "conventional" or "normal" sidewall, or whether it included a "lug boss." TS7, which was described as "Coda's design and development of a multi-purpose interface for transporting air in a self-inflating tire that can" perform 10 conjunctively-listed functions, suffered from similar vagueness: It tried to claim a list of end results or functions performed by the alleged secret without defining the structure that would accomplish them, and Coda's lawyer tried to add in the requirement of a "passage" even though that was not mentioned in the secret as alleged. TS11 and TS20 each claimed "Coda's knowledge of how to design and develop" something, without disclosing that knowledge; moreover, TS11 was nothing more than an undifferentiated list of components, and TS20 was a list of seven components without any disclosure of how they fit together to create a self-inflating tire system. Regardless, Coda mounts no appellate challenge to the court's indefiniteness rulings as to TS11 and TS20.

**No secrecy or misappropriation.** The court made alternative—and correct—holdings of no liability on each of the five alleged secrets. It correctly held that TS24—the pump-location "secret"—was not secret at all, because pumps located "close to and above the rim where the tire cyclically deforms" were disclosed in Hrabal's 2007 PCT and 2008 *Tire Technology* article. As for TS7, the court correctly held that it was neither secret (because Coda failed to meet its burden of showing secrecy) nor misappropriated (because Coda never showed that Goodyear used the 10-function interface combination claimed in TS7). TS11 correctly met a similar fate: Coda had not shown the eight-part combination was secret, nor had it shown that Hrabal disclosed any more than one of the functions to Goodyear. TS20 was correctly held to be non-secret and not used or disclosed by Goodyear for substantially the same reasons, and TS23, which claimed secrecy of three specific test results as proof that Hrabal's concept worked, was correctly rejected on JMOL for the simple reasons that none of the claimed test results had been shown to have been disclosed to Goodyear by Coda, and, as the court accurately observed, TS23 was really just a non-secret, "bald declaration" that Coda had a functional self-inflating tire; the test results were just alleged proof of that claim.

**Reasonable-royalty jury instruction.** The court did not abuse its discretion in declining to give a reasonable-royalty instruction. Ohio law allows a trade-

secret plaintiff to seek a reasonable royalty "[i]n lieu of" actual damages, Ohio Rev. Code § 1333.63(A), but here, Coda and its expert, Webster, insisted at every turn that Coda's damages were "based on actual loss." The court acted well within its discretion in declining to give an instruction on a damages theory that was "in lieu of" the one Coda actually presented.

**Inventorship.** The court correctly rejected Coda's claims for an injunction and to correct inventorship on the '586 patent. Coda's scanty appellate argument on this point never even addresses the claims of that patent, let alone shows how Hrabal supposedly invented each element before Goodyear's inventors Benedict and Losey. The court was not bound by the jury's verdict as to TS24, because inventorship requires more than the elements of trade-secret misappropriation, is decided under different legal standards and a higher standard of proof, and because that verdict was properly upended on JMOL in any event.

**Reassignment.** Coda's request to reassign the case to a new judge on remand is not well-taken. For one, no remand is necessary—the judgment should be affirmed. For another, the spurious accusations Coda hurls at the district judge—most notably, that she would be unable "to set aside her dim view of Coda and its counsel"—are sheer projection.

## STANDARD OF REVIEW

The Sixth Circuit "review[s] de novo a district court's grant of judgment as a matter of law pursuant to Fed. R. Civ. P. 50." *Kusens v. Pascal Co.*, 448 F.3d 349, 360 (6th Cir. 2006). The Sixth Circuit "review[s] the refusal to give a specifically requested [jury] instruction for an abuse of discretion." *United States v. Johnson*, 480 F. App'x 835, 840 (6th Cir. 2012). This Court reviews the district court's overall inventorship determination de novo, and the court's underlying fact-findings for clear error. *Dana-Farber Cancer Inst., Inc. v. Ono Pharm. Co.*, 964 F.3d 1365, 1370 (Fed. Cir. 2020).

## ARGUMENT

Coda accepts as correct the district court's Rule 50(a) grant of JMOL with respect to TS4, 15, 18, 19, and 27, all of which Judge Lioi refused to send to the jury "on the basis that they are indefinite." Appx17840–17841 (2649:24–2650:2). Coda also does not challenge the verdict on the five alleged secrets the jury found were not secrets, or the two it found not misappropriated. It challenges only the judge's post-trial JMOL ruling that TS7, 11, 20, and 24 were indefinite, and that Coda had failed to show that all five remaining alleged secrets—the four indefinite ones as well as TS23—were either secret or misappropriated.

The district court's grant of JMOL was correct on every ground and should be affirmed.

# I. THE DISTRICT COURT PROPERLY SET ASIDE THE JURY VERDICT AS TO CODA'S ALLEGED TRADE SECRETS

## A. The District Court Correctly Treated the Question of Trade-Secret Definiteness as One for the Court

Under Ohio law, "[a] plaintiff is required to identify a trade secret with specificity to separate the secret from general knowledge." *AtriCure, Inc. v. Jian Meng*, 842 F. App'x 974, 980 (6th Cir. 2021). *See also Alice's Home*, 2010 WL 3448319, at *4 (the proponent of a trade secret must "fully articulat[e] . . . precisely what aspects of [a product] . . . constitute[] a protectable trade secret").

Other jurisdictions likewise recognize this requirement, and, like Ohio, insist that the definiteness requirement be enforced both "pre-trial and at trial." *Olaplex, Inc. v. L'Oréal USA, Inc.*, 855 F. App'x 701, 711–12 (Fed. Cir. 2021) (Delaware law; "the Delaware courts have articulated the point in the context of discovery, with the logic of the requirement in that context carrying over to what is needed for a fair trial on liability"); *TLS Mgmt. & Mktg. Servs., LLC v. Rodríguez-Toledo*, 966 F.3d 46, 53 (1st Cir. 2020) (Dyk, J.) (Puerto Rico law; noting there is a "general requirement that '[a] person claiming rights in a trade secret bears the burden of defining the information for which protection is sought with sufficient definiteness to permit a court to apply the criteria for protection . . . and to determine the fact of an appropriation.'") (quoting Restatement (Third) of Unfair Competition § 39 cmt. D (1995)); *IDX Systems Corp. v. Epic Systems Corp.*, 285 F.3d 581, 583 (7th Cir.

2002) (Wisconsin law; "unless the plaintiff engages in a serious effort to pin down the secrets a court cannot do its job").

The district court enforced this requirement through a procedural order requiring Coda to disclose its alleged trade secrets—all supposedly disclosed orally, and crafted by a banker and lawyers years after the fact, without a shred of documentary evidence to back them up—with "sufficient specificity and description to permit defendants to know . . . what specific claims of trade secret misappropriation they must defend against." Appx02349. As the court explained, the "whole purpose of the Court's order" was to carry out the specificity requirement of Ohio trade-secret law, Appx15301–15302 (173:25–174:4), and so "the Court has to make that determination." Appx15301 (173:20).

This Court's *Olaplex* decision made the point in detail. There, applying Delaware law, this Court noted that the specificity requirement was one that began in the discovery process and continued throughout the case, "because, without particularity (pre-trial and at trial), there is an inadequate basis for a fair adjudication of what information was actually used by the defendants." 855 F. App'x at 712.

The law thus plainly imposes a threshold obligation on the trial judge to ensure that inadequately defined trade secrets are not sent to the jury. As this Court explained in *Olaplex*, "[t]he requirement of reasonable particularity matters"

because nonspecific "secrets" are not likely to be secrets, and because of the fairness concerns to defendants noted above. *Id.* This is what Judge Lioi enforced, and she did so correctly.

### B. The District Court Properly Granted JMOL on Alleged Trade Secret 24

#### 1. Alleged Trade Secret 24 Is Indefinite

The district court correctly ruled that TS24 was indefinite for two reasons. *First*, like so many of Coda's failed "secrets," it was phrased subjectively, as "Coda's knowledge regarding . . ." Appx00015. *Second*, even though Coda sought to narrow that alleged secret through a "namely" clause by naming an "optimal location for placement of a pump in a tire," what Coda provided as that "optimal location" ("close to, and above, the rim where the tire cyclically deforms in response to deformation") was not definite at all.

As the district court observed, "close to" and "above" were so amorphous that Hrabal was able to make those words mean whatever he wanted them to mean. Appx00015–00016. And Hrabal was constrained by his admissions that his 2007 PCT application and 2008 *Tire Technology* article both disclosed—as "public" information (Appx15757 (625:9–12))—locating a pump "close to, and above, the rim where the tire cyclically deforms." Appx00016. So the battle at trial (and at JMOL) metamorphosed into one over whether a "lug boss" (a term not in TS24) was part of the "sidewall," or whether TS24 was "talking about a normal standard

sidewall like what's in [Figure] 2A [of the 2007 PCT]." Appx17750 (2559:13–16), quoted at Appx00017. The court, noting that "the descriptive words 'normal' or 'standard' or 'traditional' or 'conventional' are not in TS24," Appx00017, concluded that it "should not have sent TS24 to the jury" because "the language of the trade secret was susceptible to *too many interpretations* regarding the so-called 'optimal location' and shed no light on *which* interpretation might be the one Coda claimed as secret." Appx00018. It was indefinite as a matter of law—unsurprising, considering that when Coda wrote its trade-secrets list, Coda believed there was no definiteness requirement under Ohio law, and that its list of trade secrets could only be understood with reference to other interrogatory answers and its complaint (*see supra*, p. 36, "Coda's *Daubert*").

Coda's arguments on appeal do not address these problems with TS24 as written. They merely argue that the jury was entitled to credit Coda's evidence distinguishing between "an ordinary tire" and "a tire with a flap . . . or lug boss . . . between the rest of the tire and the rim," and accuse Goodyear of "wordplay" with regard to the term "tire sidewall." But—as the court correctly noted—"ordinary tires," "flaps," "lug bosses," and distinctions between and among those concepts were not disclosed anywhere as part of TS24. Appx00017–00018. The jury could not have made any such finding distinguishing among those structures, because the alleged secret did not make such distinctions. There is no reason why a tire with a

"lug boss" could not have a pump located "in the sidewall close to, and above, the rim where the tire cyclically deforms," as TS24 recited, and there is no way to read TS24 as limited to a "standard" or "normal" tire, whatever that might have meant in Coda's or Hrabal's mind.

### 2. Alleged Trade Secret 24 Was Not Secret

The court held, alternatively, that TS24 did not claim an actual secret, for the simple reason that it was disclosed in Hrabal's 2007 PCT application and 2008 *Tire Technology* article. Appx00019, citing Appx18056–18060. Except as subsumed in its challenge to the court's definiteness ruling, Coda does not challenge this holding. In particular, Coda does not challenge that the pump in the sidewall in the *Tire Technology* article is close to and above the rim (as Hrabal admitted, *see supra*, pp. 8–9), instead contending that it is not in the sidewall, even though the article expressly says it is. Likewise for the lug-boss embodiments of the 2007 PCT. *See supra*, pp. 10–11. Coda's secrecy contentions are all premised on adding new limitations into the alleged trade secret (such as "conventional" before "sidewall"), which the court properly forbade. Appx15303–15304 (175:15–176:3); Appx17761–17764 (2570:6–2573:17).

### C. The District Court Properly Granted JMOL on Alleged Trade Secret 7

#### 1. Alleged Trade Secret 7 Is Indefinite

The court also correctly granted JMOL on TS7. That alleged secret was phrased as "Coda's design and development of a multi-purpose interface for transporting air in a self-inflating tire that can" perform 10 functions, phrased in the conjunctive. Appx00019. Here, the court was correct to hold this alleged secret indefinite as a list of "end results of, or functions performed by, the claimed trade secrets," and not any kind of a structure that could be said to be the alleged "interface." *Id.* (quoting *UOP LLC v. Exterran Energy Sols., L.P.*, No. 4:21-cv-2804, 2021 WL 8016712, at *1 (S.D. Tex. Sept. 28, 2021) (internal quotations and citation omitted)).

Coda's brief demonstrates the indefiniteness of the alleged secret it presented. To start, it adds the word "passage"—Coda's only effort to add anything resembling structure to the claimed "interface" of TS7, but a term nowhere present in the alleged secret it drafted—and then leans on Hrabal's testimony, which was also not part of the secret that it presented, to explain the value of combining these functions into a singular interface. CodaBr.31. The court was correct to conclude that TS7 "does not meet the threshold requirement of definiteness and should not have been sent to the jury." Appx00020.

### 2. Goodyear Did Not Use or Disclose Alleged Trade Secret 7, Nor Was It Secret

The court alternatively ruled that there was insufficient evidence that Goodyear misappropriated this TS7, because there was "no evidence of use or disclosure by Goodyear of a ten-function interface," and because Coda's proffered expert testimony of misappropriation was bare and conclusory, only identifying "vaguely" a couple of the functions of TS7 in Goodyear's '371 patent. Appx00021. Coda says that unauthorized use of "any substantial portion" of a trade secret is sufficient, and that its expert's conclusory testimony that "Goodyear patented a configuration that is essentially a concept of [TS7's] concept" and a "perfect knock-off" was enough to sustain the verdict. CodaBr.32.

To start, Coda described TS7 as the conjunctive combination of 10 elements, so it had to "establish that 'the *combination* of known elements or components is unique.'" *Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*, 53 F.4th 368, 380 (6th Cir. 2022). Indeed, in initially disclosing TS7, Coda described it in the disjunctive (suggesting that it need only have "one or more" of the 10 recited elements), but then revised it to require all 10 elements. *Compare* Appx10973–10974 *with* Appx11038. Coca-Cola's secret formula may include carbonated water as one ingredient, but the use of carbonated water alone could hardly misappropriate that trade secret.

Moreover, as the Sixth Circuit held in *Caudill Seed*, "a plaintiff asserting a combination trade secret over highly complex technical information cannot merely offer 'lists of broad technical concepts . . . identif[ying] categories of information' without showing which information contained within those categories constituted a trade secret." 53 F.4th at 381. That is exactly what Coda sought to do by listing out 10 broad functions and then arguing that some unspecified subset thereof is "substantially" the same.

Finally, other than offering conclusory attorney argument that the jury was "entitled to credit" his testimony (CodaBr.32), Coda has no answer for the district court's holding that its expert's testimony was "vagu[e]" and conclusory. Appx00021. It is well established under this Court's and the Sixth Circuit's caselaw that conclusory testimony cannot sustain a jury verdict. *Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494, 507 (6th Cir. 2013); *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 24 (Fed. Cir. 2012).

The court also held that Coda failed to establish the secrecy of TS7. Appx00023. Coda limits its response to this holding to attacking the court's presumed concession from Coda's failure to address the issue in its post-trial briefing (CodaBr.32 n.1), but other than providing a citation to two appendix pages to claim the absence of a "concession" (Appx18674–18675), Coda provides no factual basis to show that it ever established the secrecy of TS7. Under Ohio law,

it was Coda's burden to show secrecy of the 10-element combination (assuming it was a sufficiently definite and protectible secret), and, as Goodyear showed without Coda's refutation, the generic swaths of trial testimony on which Coda relied to claim that it had proved secrecy never mentioned a trade secret, let alone secrecy of the multi-function interface recited in TS7. Appx18734; *see also* Appx18675.

### D. The District Court Properly Granted JMOL as to Alleged Trade Secret 11

#### 1. Alleged Trade Secret 11 Is Indefinite

Here again, Coda's TS11 was framed as a matter of "Coda's knowledge of how to design and develop" something—here, "self-inflating tire pump and groove solutions, consisting of" eight conjunctive components. As the court correctly observed, other than the undisclosed "knowledge" being claimed as a trade secret, "the bulk of th[is] trade secret as articulated is no more than an undifferentiated list of components," which "cannot meet the definiteness requirement." Appx00021 (citing *UOP LLC*, 2021 WL 8016712, at *1). *See also Caudill Seed*, 53 F.4th at 381.

"[T]o make matters worse," the district court accurately observed, some of the undifferentiated components on that list of eight were "so vague as to be meaningless"—for example, knowledge of "variant pump tube, groove and chamber dimensions, size and materials," but with no disclosure of what the

"knowledge" or the variables were. Appx00021–00022. Similarly, by claiming "pump tube and groove design to minimize internal friction" without disclosing "*what* that friction-minimizing design is," Coda left the alleged secret vague and undefined. Appx00022.

Coda never addresses the indefiniteness problems with this secret. It avers that "TS 11 is definite," quotes TS11, and then goes on to say that "Hrabal testified at length about a key hurdle he overcame—the problem of the pump tube 'walking away.'" CodaBr.33. But the so-called "walking-away" problem was not even mentioned in TS11; it was mentioned in Coda's TS12, which Coda abandoned before trial. Appx00022 & n.16. As the court correctly held, Coda "failed to articulate that in TS11." Appx00022.

After that, Coda argues about Goodyear's use and disclosure and secrecy, but not indefiniteness. CodaBr.32–34. Having failed to address the district court's indefiniteness ruling with respect to alleged TS11, Coda forfeited its appellate challenge. *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006) ("Our law is well established that arguments not raised in the opening brief are waived.").

#### 2. Alleged Trade Secret 11 Is Not Secret, and Goodyear Did Not Use or Disclose It

As to secrecy, the court correctly held that Coda's "broad references to Hrabal's testimony regarding the alleged secrecy of his 'technology' do not suffice

to pinpoint evidentiary proof as to the secrecy of TS11 in particular," and that Coda "makes no showing that the eight-part combination was not generally known or readily ascertainable in 2009." Appx00023. Coda's response to the former is a single sentence of citation-free attorney argument: "But there is no requirement that secrecy be proved through separate testimony for each secret rather than general testimony by the inventor that he keeps his secrets confidential." CodaBr.34–35. That is an incorrect statement of law: A trade-secret claimant must demonstrate that *the claimed secret itself* "is the subject of efforts that are reasonable under the circumstances to maintain *its secrecy.*" Ohio Rev. Code § 1333.61(D)(2). The economic value of a claimed trade secret comes from *its secrecy,* not generic policies of secrecy. (Plus, factually, Hrabal was profligate in spreading information about his self-inflating-tire technology, and never availed himself of the parties' confidentiality-designation provision—hardly the mark of a man who "keeps his secrets confidential.") And its response to the latter—the absence of proof that the eight-part combination was "not generally known or readily ascertainable in 2009"—is completely absent and therefore forfeited. *SmithKline Beecham*, 439 F.3d at 1319.

As for alleged disclosure to Goodyear, Coda accuses the district judge of "distort[ing] the referenced testimony" by saying that "Hrabal testified that he disclosed only one of the eight elements in TS11 (the second one)." CodaBr.34.

But nowhere does Coda say that the district court incorrectly characterized Hrabal's testimony—nor could it. Coda's litany of examples fails to show disclosure, at the 2009 meetings, of any of the other seven conjunctive categories of "undifferentiated . . . components." Appx00021. And it relies heavily on the undisclosed "walking away" problem that *had* been recited in abandoned TS12.

As for alleged use by Goodyear, Coda only discusses two of the eight components of TS11—a tubeless solution and an elliptical cross-section. CodaBr.33. But those two components had been publicly disclosed by Coda. *See supra*, pp. 15–16. If they are "substantially" the trade secret, it was not secret.

The court was thus correct to conclude that "there is neither evidence of secrecy on Hrabal's part nor of use/disclosure by Goodyear of Hrabal's eight-element solution, and no reasonable jury could have concluded otherwise on this record." Appx00023.

### E. The District Court Properly Granted JMOL as to Alleged Trade Secret 20

#### 1. Alleged Trade Secret 20 Is Indefinite

"Again we have a trade secret claiming protection for 'knowledge of how to design and develop' something, with no disclosure of what that knowledge is and/or what that design or development is." Appx00024. For this reason, and because the asserted trade secret "does not disclose how [the seven disclosed components] fit together . . . to create 'self-inflating tire systems with circulating

and non-circulating pump variations,'" the district court properly granted JMOL of indefiniteness. Appx00024.

Coda does not respond to the court's indefiniteness analysis, other than to aver in conclusory fashion that its holding was "error." CodaBr.35. It "offer[ed] no argument" on definiteness in the district court, either. Appx00024. Coda has forfeited its challenge to the court's indefiniteness ruling. *SmithKline Beecham*, 439 F.3d at 1319.

#### 2. Alleged Trade Secret 20 Is Not Secret, and Goodyear Did Not Use or Disclose It

The court alternatively held that "there is neither evidence of secrecy on Hrabal's part nor of use/disclosure of TS20 by Goodyear, and no reasonable jury could have concluded otherwise on this record." Appx00025. There was no evidence that Hrabal made any effort to keep the entire combination secret (and the entire, conjunctive combination was what he claimed was his secret). Appx00025–00026 (citing *Caudill Seed*, 53 F.4th at 380). And there was no evidence that he disclosed the entire combination to Goodyear, or that Goodyear used the entire combination. Appx00026.

The court found that "any effort by Coda to rely on disjointed testimony regarding some—but not all—of the seven required elements of TS20 . . . is insufficient to prove secrecy as to the entire combination." Appx00025. Coda says the court was "factually mistaken," string-citing the same trial testimony

(Appx15541, Appx15597, Appx15621, Appx15671, Appx15832, Appx16737–16738) it cited to the district court (*see* Appx18680–18681), but none of that testimony shows secrecy of the required elements of TS20. CodaBr.36. And it claims the court "legally" erred because "trade secret protection applies to a unique *combination* even if *none* of the elements is itself secret." *Id.* But that is exactly the hole the court detected in Coda's proofs: There was no evidence that Hrabal had ever *disclosed* the entire combination to Goodyear, or that Goodyear had *used* the combination. *See* Appx00026 & n.17 ("[U]se of one or two elements is not proof of use of the entire combination."). Absent such evidence, there was no basis for a misappropriation verdict, as Judge Lioi correctly held.[4]

### F. The District Court Properly Granted JMOL as to Alleged Trade Secret 23

TS23 is directed to "Coda's development of a functional self-inflating tire as demonstrated by" three specific test results. Appx00026. The court granted JMOL on TS23 on two independent grounds—that Goodyear did not use or disclose it and that TS23 "actually reveals no secret at all." Appx00027–00028.

---

[4] In Coda's current telling, TS20 is the idea of a recirculating system or a non-recirculating system (dead space), coupled with valves and pressure regulation. CodaBr.35. All that was publicly disclosed by Coda. *See supra*, pp. 16–18. Coda's brief identifies nothing secret about these concepts, nor that the secret thing was used by Goodyear, instead only asserting that "Goodyear used both the dead space and recirculating concepts in its patents and AMT project." CodaBr.36–37.

### 1. Goodyear Did Not Use or Disclose Alleged Trade Secret 23

The court, after evaluating the evidence, concluded that Coda had not shown Goodyear's use or disclosure of TS23. Appx00027. Coda's only evidence of disclosing testing data to Goodyear was a single email from Hrabal to Goodyear, after the January 2009 meeting, disclosing only one test result—achieving 6.5A of pressure in Coda's prototype tire. Appx23469. That result did not match the purported test result in TS23 (6.5A from a pump in the *tread*), and completely omitted the two other test results. Appx00027. The court also relied on the fact that Coda failed to mark this email as "confidential" under the NDA. Appx00027; Appx15727–15729 (595:25–597:15).

Coda argues that the mismatch between TS23 and the email is irrelevant because "Hrabal testified that he disclosed TS23 to Goodyear." CodaBr.39–40 (citing Appx15546–15547; Appx15584). The assertion is not supported by Coda's two citations. In the first, Hrabal said the single test result in the nonconfidential email was conveyed to Goodyear. Appx15546–15547 (414:20–415:1). In the second, Hrabal merely agreed that TS23 is "related to [his] testing results communicated to Goodyear." Appx15584 (452:19–24). Neither says that Hrabal disclosed any of the three TS23 test results to Goodyear.

Coda nonetheless argues that "[t]he jury was entitled to infer that Goodyear relied heavily on Coda's testing data." CodaBr.39. But there is no reasonable

inference to be drawn—as Judge Lioi aptly observed—that Goodyear somehow used three specific test results for which there is no evidence of disclosure to Goodyear: "This is merely argument, without supporting evidence." Appx00027.

As for Coda's failure to mark the email as "confidential," no reasonable jury could conclude that Goodyear understood this email to contain confidential information, when Coda failed to follow the NDA's mechanism for indicating a document's confidentiality.

### 2. Alleged Trade Secret 23 Was Not Secret

Finally, Judge Lioi correctly concluded that TS23 was really just the non-secret, "bald declaration" that Coda had a self-inflating tire, and that the three test results only confirmed Coda's claimed success. Appx00028. Coda calls this conclusion "plainly erroneous" and claims that the alleged secret "relates to confidential numerical testing results showing that Coda's self-inflating tire solutions could pump pressures sufficient to inflate both consumer and commercial truck tires." CodaBr.38. Coda never explains why its public disclosures—for which it won awards—did not do the same. Appx23865 (Coda's public disclosure that "[t]ests conducted on a regular passenger car wheel" prove pressures sufficient for inflation); Appx23868 (Coda's public disclosure that its "tests have shown that between today's regular tires and rims there is sufficient pressure to enable tire

inflation"). The specific results in TS23 are no different from those public statements.

* * * *

Judge Lioi gave this case the careful attention that Ohio trade-secret law requires, and she filtered out Coda's vague, indefinite trade secrets. Her conscientious post-trial rulings should be affirmed in their entirety.

## II. THE DISTRICT COURT PROPERLY DENIED CODA'S REQUEST FOR A JURY INSTRUCTION ON REASONABLE ROYALTY DAMAGES

The court, after "hear[ing] the entirety of the evidence," concluded that "plaintiffs, being the master of their case," had presented only actual loss as their damages theory at trial, and not a case for a hypothetical reasonable royalty. Appx17854 (2663:10–16). The court observed that Coda's damages expert, who "prepared a very extensive report," "insisted . . . that her damage calculation was based on actual loss." *Id.* (2663:2–6). *See also* Appx16614 (1482:13–17); Appx16616 (1484:16–19). The court determined that because "the plaintiffs, through Ms. Webster's report, made it very clear they were pursuing an actual damage claim," it would "tak[e] them at their word" and decline to give a reasonable-royalty instruction. Appx17855 (2664:2–8). As the court explained, "it would be inappropriate and there would be no guidance for the jury here as to how should they decide to go with a reasonable royalty calculation, how that would

ever be calculated, given the lack of evidence relative to some of that portion of that damage calculation in the court's estimation." Appx17854–17855 (2663:21–2664:1).

Coda disputes none of the factual bases for the court's ruling. It never denies that it, and Webster, put on only a case of actual loss. Instead, it devotes the lion's share of its briefing on this point to arguing an unexceptional proposition—that a reasonable royalty can, in appropriate cases, supply a proper measure of damages in trade-secret cases. CodaBr.41–45. Coda refuses to address the court's actual reason for not giving a reasonable-royalty instruction: Coda hadn't presented a reasonable-royalty case.

The Sixth Circuit "reviews a district court's refusal to give requested jury instructions under an abuse of discretion standard," *King v. Ford Motor Co.*, 209 F.3d 886, 897 (6th Cir. 2000), defined as "a definite and firm conviction that the trial court committed a clear error of judgment." *Bowling v. Pfizer, Inc.*, 102 F.3d 777, 780 (6th Cir. 1996). Coda nowhere mentions this highly deferential standard of review. Further, the law is clear that a party is not entitled to an instruction on a theory not supported by the evidence. *See King*, 209 F.3d at 898 (affirming refusal to give duty-to-warn instruction because that "was not [appellant's] theory of the case"); *id.* at 899 (collecting cases refusing to instruct jury on an issue in cases of "insufficient evidence," "on a theory not pleaded by a party and not supported by

evidence," and "where party requesting instruction offered 'vague evidence' to support its argument").

Here, Coda did not submit a reasonable-royalty case. Rather, its expert's submission was based entirely on a theory of actually lost license fees caused by Goodyear's alleged misappropriation. Appx16614 (1482:13–17); Appx16616 (1484:16–19) ("actual loss" in the form of "lost licensing opportunity"). Unlike patent law, Ohio trade-secret law does not impose a reasonable-royalty "floor" for damages; it allows a claimant to seek a reasonable royalty only "[i]n lieu of damages measured by any other methods." Ohio Rev. Code § 1333.63(A). Here, Coda was required to provide a calculation of damages to Goodyear under Fed. R. Civ. P. 26(a)(1)(iii), and the only one it ever provided was Webster's fanciful actual-loss theory. *See supra*, pp. 34–36, 38.

Coda's belated claim that it should have been able to argue a reasonable-royalty damages theory (apparently limited to TS24—CodaBr.47) based on a single piece of Goodyear valuation evidence (*see* CodaBr.48), when that was neither Coda's nor its expert's theory of the case, is exactly the sort of "vague" and "not supported" theory that the Sixth Circuit's cases uniformly affirm to be well within district-court discretion to decline to instruct upon.

The Court need not reach this issue should it affirm the district court's grant of JMOL, as it should. If it does reach the issue, it should affirm.

## III. THE DISTRICT COURT PROPERLY FOUND THAT CODA FAILED TO PROVE INVENTORSHIP AND PROPERLY DENIED CODA'S REQUEST FOR AN INJUNCTION

Coda devotes less than two full pages to arguing that the court erred in denying Coda's requests for an injunction and correction of inventorship on the '586 patent. The only error alleged is that the court disregarded the jury verdict of misappropriation—a complete sideshow of an argument, given that the jury's verdict, even had it remained in place, was decided by a preponderance of the evidence, and would not have "constrained" (CodaBr.51) the court's clear-and-convincing-evidence decision on inventorship.

### A. The District Court Properly Found That Coda Did Not Prove Hrabal's Sole Inventorship of the '586 Patent

Coda's brief never discusses the claims of the '586 patent—a telling omission from an inventorship claim—nor explains how Hrabal invented each claim element before named inventors Benedict and Losey. Nor does Coda challenge the finding (Appx00049 (¶ 40)) that Coda failed to show that Hrabal conceived of each claim element. Instead, Coda argues that the jury's (vacated) finding of misappropriation of five trade secrets mandates that Hrabal be named sole inventor. CodaBr.50–52. The unstated premise of Coda's argument is that one or more of the five trade secrets (Coda does not say which, but seemingly it would be TS24) has the same scope as all of the uncited, undiscussed claims of the '586 patent. Coda's argument is factually and legally insufficient to establish sole

inventorship by clear-and-convincing evidence.

*First*, the '586 patent claims do not have the same scope as TS24 (or any other alleged trade secret). Each independent claim requires (1) a groove in the compression side of the bending strain neutral axis in a bending region of a tire; and (2) a tube in that groove in contacting engagement with opposite groove surfaces, such that the groove will bend and press the tube closed as the tire rotates through the footprint. These compression zones can be at multiple locations (*e.g.*, 200, 202, or 204, below) throughout the tire:



FIG−9B

Appx00078; Appx00083 (9:48–67).

TS24 says nothing about these limitations, instead stating that a peristaltic pump is located "in the sidewall close to, and above, the rim where the tire cyclically deforms in response to deformation." It mentions nothing about a compression side within a bending region, or a groove, or the groove pressing a tube closed, and the jury made no findings that Benedict or Losey misappropriated

or learned such ideas from Coda. No witness testified that TS24 has the same scope as any ’586 patent claim. Indeed, at the pre-trial conference, Coda’s counsel argued that TS16’s “tube in groove pump solution” “is what is claimed in the ’586 patent,” Appx18916–18917 (96:17–97:8)—but the jury rejected TS16 as being a trade secret. Appx17997.

*Second*, a court deciding an inventorship claim is not bound by a jury finding of a related trade-secret-misappropriation claim, because the standards of proof and elements are different. *See, e.g.*, *Bianco v. Globus Med., Inc.*, 30 F. Supp. 3d 565, 579–80 (E.D. Tex. 2014), *aff’d*, 618 F. App’x 1032 (Fed. Cir. 2015) (*per curiam*). In *Bianco*, Judge Bryson, sitting by designation, emphasized that “inventorship requires more than just providing the germ of an idea or the incentive to others to conceive of an invention and reduce it to practice,” and he found that a trade secret misappropriated there (certain drawings) did not demonstrate conception of the claims of the patents-in-suit. *Id.* Here, Coda never even attempted to show that each element of the ’586 patent’s 19 claims was conceived by Hrabal or present in TS24—or any other alleged secret.

Coda’s case—*Kitchen v. Chippewa Valley Sch.*, 825 F.2d 1004 (6th Cir. 1987)—is off-point. *Kitchen* held that a jury finding of no liability on a state-law retaliation claim was inconsistent with the district court’s finding of liability on a Title VII retaliation claim because “[t]he standards of liability for both claims

appear to be identical" and "arose out of the same underlying facts." *Id*. at 1013. That is not the situation present here, as demonstrated by *Bianco*, and by a simple comparison of TS24 with the '586 patent's claims.

*Third*, the standards for Coda's trade-secret and sole-inventorship claims differ in other ways, too. The trade-secret claims were decided under the preponderance-of-the-evidence standard, while inventorship was decided by the clear-and-convincing-evidence standard. *Compare* Appx17862 (2671:1–3) *with* Appx00049–00050. Likewise, for inventorship, but not trade-secret misappropriation, Coda was required to provide corroboration. *Compare Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1350 (Fed. Cir. 2001) *with ScentSational Techs. LLC v. PepsiCo, Inc.*, 773 F. App'x 607, 611 (Fed. Cir. 2019) (purported inventor's declaration was evidence of trade secret but lacked corroboration necessary to support inventorship claim). Despite the corroboration requirement, no competent evidence did so; Coda's brief cites none. Coda does not even challenge the court's finding (Appx00048 (¶ 36)) that Hrabal failed to corroborate his alleged conception.[5] *See also supra*, pp. 27–31, discussing

[5] Coda reproduces an illustration in its brief (CodaBr.26), but that illustration is from 2010 (thus post-dating the '586 patent), was not made by Hrabal, was not corroborated by anyone, and does not show a groove within the compression side of a neutral axis. Appx15811 (679:5–19); Appx23688. The crevice cuts almost all the way across the sidewall. Appx15812 (680:3–5). Hrabal did not think a tire like it could be made and, if made, did not know if it would rip open. Appx15812–15813 (680:9–681:2).

evidence showing Hrabal's belief that the '586 claims were in the prior art.

Finally, the court analyzed in detail Hrabal's asserted theory behind his pump-location trade secrets, and found it the opposite of the '586 patent's mode of operation: Hrabal's "scissors" theory places the pump closer to the neutral axis, while the '586 patent prefers to maximize the distance from the air tube to the neutral axis. Appx00047–00048 (¶¶ 35–38). Coda does not challenge these findings, either.

The court's inventorship decision should be affirmed.

### B. The District Court Properly Denied Coda's Request for an Injunction

The sole alleged error in the court's denial of an injunction is that the court vacated the jury's findings against Goodyear. As discussed above, the court properly granted JMOL for Goodyear. Therefore, its denial of Coda's injunction request was correct.

## IV. THE ISSUE OF LACHES IS NOT BEFORE THIS COURT

The court determined that "laches need not be addressed." Appx00035. "This court declines to address issues not decided by the district court." *Waymark Corp. v. Porta Sys. Corp.*, 245 F.3d 1364, 1368 (Fed. Cir. 2001); *Cicena Ltd. v. Columbia Telecomms. Grp.*, 900 F.2d 1546, 1552 (Fed. Cir. 1990) (issues not decided below are not before the court on appeal). Even were there to be a remand, there would be no basis for this Court to make an advisory determination

on this equitable issue in the first instance.

## V. THOUGH REMAND IS UNNECESSARY, REASSIGNMENT WOULD BE INAPPROPRIATE

Coda concludes by requesting reassignment to another judge in case of a remand. Because the judgment was correct and should be affirmed, this Court need not reach this issue, either. Even were it necessary to do so, the Court should reject Coda's request.

There is some common ground between the parties. This Court has the authority to reassign a case, *see* 28 U.S.C. § 2106, and "regional circuit law governs reassignment questions." *Eolas Techs., Inc. v. Microsoft Corp.*, 457 F.3d 1279, 1282 (Fed. Cir. 2006). This Court's deference to regional circuit law is based "on a concern for 'consistency of future trial management.'" *Id.* (quoting *Biodex Corp. v. Loredan Biomedical, Inc.*, 946 F.2d 850, 857–58 (Fed. Cir. 1991)). Here, that "regional circuit law" is the Sixth Circuit's.

That is where common ground ends. The Sixth Circuit has "frequently emphasized" that "reassignment is an 'extraordinary power and should be rarely invoked . . . . [R]eassignments should be made infrequently and with the greatest reluctance.'" *Sagan v. United States*, 342 F.3d 493, 501 (6th Cir. 2003) (quoting *Armco, Inc. v. United Steel-workers of Am., AFL-CIO, Local 169*, 280 F.3d 669, 683 (6th Cir. 2002)). Nowhere does Coda's brief even hint at the Sixth Circuit's

"frequently emphasized" "reluctance" to reassign cases, let alone deal with that court's heightened, extraordinary standard for doing so.

The reason is plain: The request for reassignment is a strategic exercise in projection, meant to blame the careful work of a conscientious judge for Coda's own failings. The procedural reversal in the earlier appeal hardly was the result of bias (*see* CodaBr.57), but simply gave Coda the opportunity to replead its case with more particular facts—an opportunity that Coda squandered by failing to define its "secrets" with any degree of certainty.

There was no error, let alone reversible error, here. Regardless, there would be no basis for this Court to conclude that the three-factor test applied by the Sixth Circuit in such cases as *Armco* and *Sagan*, compels reassignment: There is no indication of personal bias by the district judge; there is no indication that she would have "substantial difficulty in putting out of [her] mind previously-expressed views or findings determined to be erroneous"; reassignment is not "advisable to preserve the appearance of justice"; and, particularly in this fact-specific case involving application of Ohio law, reassignment here would "entail waste and duplication out of proportion to any gain in preserving the appearance of fairness." *In re Saffady*, 524 F.3d 799, 805 (6th Cir. 2008). That same "concern for 'consistency of future trial management,'" *Eolas*, 457 F.3d at 1282, drives this Court's own reluctance to reassign cases. *See also Micro Chem., Inc. v. Lextron,*

*Inc.*, 318 F.3d 1119, 1122 (Fed. Cir. 2003) (refusing to reassign a bench-tried patent case after *three* seriatim reversals by this Court).

Now-Chief Judge Lioi—both in the initial proceedings and in the conduct of this trial—was the model of a careful, considerate judge. No objective observer could seriously question her commitment to impartiality and justice.

## CONCLUSION

This Court should affirm.

Dated: January 19, 2024

Respectfully submitted,

/s/ *Gregory A. Castanias*

GREGORY A. CASTANIAS
TRACY A. STITT
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
(202) 879-3939
gcastanias@jonesday.com
tastitt@jonesday.com

CALVIN P. GRIFFITH
DAVID M. MAIORANA
JOHN C. EVANS
THOMAS S. KOGLMAN
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114-1190
(216) 586-3939
cpgriffith@jonesday.com
dmaiorana@jonesday.com
jcevans@jonesday.com
tkoglman@jonesday.com

*Counsel for Defendants-Appellees The Goodyear Tire & Rubber Company and Robert Benedict*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned hereby certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Circuit Rule 32(b).

1. Exclusive of the exempted portions of the brief, as provided in Federal Rule of Appellate Procedure 32(a)(7)(B), the brief contains 13,986 words.

2. The brief has been prepared in proportionally spaced typeface using Microsoft Word 2016 in 14 point Times New Roman font. As permitted by Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

Dated: January 19, 2024

*/s/ Gregory A. Castanias*
Gregory A. Castanias

*Counsel for Defendants-Appellees The Goodyear Tire & Rubber Company and Robert Benedict*

## CERTIFICATE OF SERVICE

I hereby certify that on January 19, 2024, I filed the foregoing BRIEF FOR DEFENDANTS-APPELLEES via CM/ECF with the U.S. Court of Appeals for the Federal Circuit, which serves the brief on all counsel of record.

*/s/Gregory A. Castanias*
Gregory A. Castanias

*Counsel for Defendants-Appellees The Goodyear Tire & Rubber Company and Robert Benedict*